

**FILED**

Mar 11 2015, 6:46 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Patricia Caress McMath
Michelle C. Langdon, Certified Legal Intern
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| D.Y., *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff* | March 11, 2015 <br><br> Court of Appeals Cause No. 49A02-1405-JV-298 <br><br> Appeal from the Marion Superior Court <br><br> Lower Court Cause No. 49D09-1402-JD-339 <br><br> The Honorable Marilyn Moores, Judge <br> The Honorable Geoffrey Gaither, Magistrate |

**Pyle, Judge**

## Statement of the Case

[1] Defendant/Appellant, D.Y., appeals his adjudication as a delinquent child, which was based on the juvenile court's true finding that he had committed

dangerous possession of a firearm[1] and carrying a handgun without a license.[2] D.Y. was a potential suspect in a burglary, and a police officer told him that he was going to transport him to police headquarters for the burglary investigation. Prior to putting D.Y. into the police vehicle, the officer patted him down and discovered a firearm in D.Y.'s jacket. Subsequently, the State filed a petition alleging that D.Y. was a delinquent child for committing dangerous possession of a firearm and carrying a handgun without a license, both of which would be Class A misdemeanors if committed by an adult. D.Y. filed a motion to suppress the evidence of the firearm, arguing that it was the result of an illegal search. The juvenile court denied the motion and adjudicated D.Y. a delinquent child.

[2] On appeal, D.Y. now argues that the juvenile court abused its discretion in admitting the firearm because it was the result of an unlawful search. He asserts that the search was unlawful because: (1) it was incident to an unlawful arrest; (2) it was incident to an unlawful investigatory stop; and (3) the officer did not have reasonable concerns for safety to justify the search. We conclude that the juvenile court abused its discretion in admitting the firearm because it was obtained through a search incident to an unlawful arrest. Because the evidence of the firearm was an essential element of D.Y.'s charges, we reverse

---

[1] IND. CODE § 35-47-10-5.

[2] I.C. § 35-47-2-1.

and remand to the juvenile court with instructions to vacate its true findings and D.Y.'s adjudication as a delinquent child.

We reverse and remand with instructions.

## Issue

Whether the juvenile court abused its discretion when it admitted evidence of a firearm found in D.Y.'s pocket during a pat down.

## Facts[3]

On February 17, 2014, Officer Sydney McDaniel ("Officer McDaniel") of the Indianapolis Metropolitan Police Department ("IMPD") was dispatched to the scene of a disturbance near 12th Street and Concord Street in Indianapolis. When he arrived, he found two males confronting a juvenile, A.I., about a burglary that they believed he had committed the previous month ("First Burglary"). Another male, Brian Smith ("Smith"), was also at the scene and was confronting A.I. about a separate burglary of his house that had occurred the prior weekend ("Second Burglary"). Officer McDaniel questioned the three alleged victims and, based on the information they gave him, detained A.I. and transported him to the police department's roll call for questioning. Officer

---

[3] We held an oral argument in this case on February 11, 2015 in the Court of Appeals Courtroom. We thank counsel for their preparation and presentation.

McDaniel then followed Smith to his house to make a report of the Second Burglary.

[6] At Smith's house, Smith told Officer McDaniel that he and his wife had gone on a short vacation the previous weekend. When they returned, they found that someone had kicked in their back door and ripped the plastic that had been over the door. They also discovered that Smith's big screen television and Xbox were missing, although a broken Xbox in another room was still there. Smith told Officer McDaniel that he suspected that A.I., D.Y., and/or one other individual had been involved in the burglary because they had frequently played video games at his house and knew which Xbox was broken.[4]

[7] Officer McDaniel made a report of the burglary and called IMPD Detective Mark Howard ("Detective Howard"), who also came to the scene and spoke to the Smiths. Afterwards, both officers left Smith's house, and Detective Howard returned to the IMPD's southwest district headquarters. There, another detective contacted Detective Howard and told him that there was a possibility that D.Y. was also a suspect in the First Burglary. However, Detective Howard never communicated this information to Officer McDaniel.

[8] Later that day, Officer McDaniel received a dispatch that Smith's wife had called to say that D.Y. was on the way to Smith's house to talk to Smith about

---

[4] Officer McDaniel also testified that D.Y. had known that Smith was going to be out of town for the weekend. Later, however, Smith himself testified that D.Y. "might have known" he was going to be out of town, but he could not remember. (Tr. 53).

his suspicions. Officer McDaniel called Detective Howard with the information, and Detective Howard told Officer McDaniel to "detain" D.Y. and bring him into roll call so that he could give a statement. (Tr. 24).

[9] When Officer McDaniel arrived at Smith's house, Smith and D.Y. were sitting on the couch talking. Officer McDaniel explained to D.Y. "why it [was] that [he] was there and that [he] would be transporting [D.Y.] to [IMPD's] district roll call for some burglary investigation that he was a possible suspect in." (Tr. 38). Officer McDaniel then "told [D.Y.] that [he] would have to search him to put him in [the] police vehicle so that he could be transported." (Tr. 38). Thereafter, Officer McDaniel conducted a pat down search of D.Y. and found a gun in his jacket pocket.[5] Because Officer McDaniel was aware that D.Y. was under the age of eighteen, he secured the weapon, placed D.Y. in handcuffs, and transported him to the police headquarters.

[10] The next day, on February 18, 2014, the State filed a petition alleging that sixteen-year-old D.Y. was a delinquent child for committing one count of dangerous possession of a firearm and one count of carrying a handgun without a license, both of which would have been Class A misdemeanors if committed

---

[5] The record revealed that the gun was not loaded.

by an adult. Subsequently, D.Y. moved to suppress the evidence of the firearm that Officer McDaniel had found as a result of his pat down.[6]

[11] On March 13, 2014, the juvenile court held a denial and suppression hearing concerning the State's petition and D.Y.'s motion to suppress. During the hearing, D.Y. argued that Officer McDaniel's pat down had violated his constitutional rights under the United States and Indiana constitutions and that, as a result, the juvenile court should suppress the firearm discovered during the search. The State argued that the pat down did not violate D.Y.'s constitutional rights because Officer McDaniel had probable cause or reasonable suspicion that D.Y. had committed a burglary, as well as reasonable concerns for his safety. D.Y. disputed each of these arguments. Ultimately, the juvenile court denied D.Y.'s motion to suppress and entered a true finding on both of D.Y.'s charges, thereby adjudicating him a delinquent child. On April 3, 2014, the court held a dispositional hearing and placed D.Y. on probation to last until July 31, 2014, for the dangerous possession of a firearm finding. The juvenile court dismissed the finding of carrying a handgun without a license. D.Y. now appeals.

---

[6] There is no evidence of a written or oral motion to suppress evidence in the record, but it is clear from the transcript of the suppression hearing that D.Y. filed such a motion prior to the hearing.

# Decision

[12] On appeal, D.Y. argues that the juvenile court abused its discretion when it admitted the evidence of the firearm because the firearm was obtained pursuant to an illegal search. He asserts that the search was illegal because Officer McDaniel arrested him without a warrant or probable cause and, thus, the subsequent search violated his right to be free from search and seizure under the United States and Indiana constitutions. Alternately, D.Y. argues that, even if Officer McDaniel's actions did not constitute a seizure or arrest, Officer McDaniel still conducted an investigatory stop without reasonable suspicion that he had committed a burglary. Finally, D.Y. contends that, even if Officer McDaniel had reasonable suspicion to conduct the stop, the officer could not justify his pat down of D.Y. based on concerns for officer safety because he did not have a reasonable fear of danger.

[13] Preliminarily, we note that the juvenile court here held a hearing on D.Y.'s motion to suppress in conjunction with his denial hearing and ruled on the matter as a question of admissibility. We review a ruling concerning the admissibility of evidence for an abuse of discretion. *S.G. v. State*, 956 N.E.2d 668, 674 (Ind. Ct. App. 2011), *trans. denied.* We will find that a juvenile court has abused its discretion only when its decision is clearly against the logic and effect of the facts and circumstances before it. *Holbert v. State*, 996 N.E.2d 396, 399 (Ind. Ct. App. 2013), *trans. denied.* In making this determination, we cannot reweigh the evidence or judge witness credibility, and we must consider conflicting evidence in the light most favorable to the juvenile court's ruling.

*Johnson v. State*, 992 N.E.2d 955, 957 (Ind. Ct. App. 2013), *trans. denied*. Further, it is well-settled that when reviewing the constitutionality of a search or seizure, we must examine "'any uncontested evidence favorable to the appellant.'" *Id.* (quoting *Fair v. State*, 627 N.E.2d 427, 434 (Ind. 1993)). "'Although a trial court's determination of historical facts is entitled to deferential review, we employ a *de novo* standard when reviewing the trial court's ultimate determinations of reasonable suspicion and probable cause.'" *Id.* (quoting *Lindsey v. State*, 916 N.E.2d 230, 238 (Ind. Ct. App. 2009), *trans. denied*).

[14] The Fourth Amendment to the United States Constitution protects both privacy and possessory interests by prohibiting unreasonable searches and seizures.[7] *N.W. v. State*, 834 N.E.2d 159, 161-62 (Ind. Ct. App. 2005), *trans. denied.* As a general rule, the Fourth Amendment prohibits warrantless searches. *Id.* at 162. However, the warrant requirement of the Fourth Amendment is subject to a few well-delineated exceptions. *Johnson v. State*, 710 N.E.2d 925, 927 (Ind. Ct. App. 1999). When a search is conducted without a warrant, the State has the burden of proving that an exception to the warrant requirement existed at the time of the search. *Holbert*, 996 N.E.2d at 399. Generally speaking, we must exclude evidence directly obtained via an illegal search under the fruit of the poisonous tree doctrine. *Clark v. State*, 994 N.E.2d 252, 266 (Ind. 2013).

---

[7] It is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Id.*

Here, the State argues that an exception to the warrant requirement existed at the time of the search because Officer McDaniel had reasonable suspicion to conduct an investigatory stop of D.Y., as well as reasonable concerns for his safety to justify a pat down search. In support of this argument, the State cites our precedent that, in the case of a lawful investigatory stop, an officer may conduct a

> [r]easonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

*Wilson v. State*, 745 N.E.2d 789, 792 (Ind. 2001) (quoting *Terry*, 392 U.S. 1, 27 (1968)). In response, D.Y. argues that Officer McDaniel's stop was so intrusive that it constituted a "seizure", or arrest, without probable cause or a warrant, rather than a lawful investigatory stop. The State acknowledges that Officer McDaniel did not have probable cause or a warrant to arrest D.Y., so we must first determine whether Officer McDaniel's stop of D.Y. constituted an investigatory stop or an arrest.

Under the Fourth Amendment, a full-blown arrest or a detention that lasts for more than a short period must be justified by probable cause. *Reinhart v. State*, 930 N.E.2d 42, 45 (Ind. Ct. App. 2010). However, the United States Supreme Court held in *Terry*, that an officer may make a brief investigatory stop without

probable cause if the officer has a reasonable suspicion that the person detained is involved in criminal activity. 392 U.S. at 88. A *Terry* stop is a lesser intrusion than an arrest, and the scope of an investigatory stop accordingly involves only "'inquiry necessary to confirm or dispel the officer's suspicions.'" *Reinhart*, 930 N.E.2d at 46 (quoting *Hardister v. State*, 849 N.E.2d 563, 570 (Ind. 2006)). A *Terry* stop may qualify as an arrest if it becomes so intrusive that it "'interrupts the freedom of the accused and restricts his liberty of movement.'" *Id.* (quoting *Sears v. State*, 668 N.E.2d 662, 667 (Ind. 1996)) (explaining the difference between an investigative stop and an arrest).

[17] There is no "'bright line'" test for evaluating whether a stop is investigatory in nature or an arrest, and we have held that "'common sense and ordinary human experience must govern over rigid criteria.'" *Id.* (quoting *Mitchell v. State*, 745 N.E.2d 775, 782 (Ind. 2001)). In *Terry*, the United States Supreme Court suggested that a person has been "seized", or arrested, for Fourth Amendment purposes only when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." 392 U.S. at 19, n.16. In *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980), the Supreme Court adhered to this standard, but added that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." The Court gave examples of situations in which a reasonable person may not feel free to leave, including where there has been "the threatening presence of several officers, the display of a weapon

by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's requests might be compelled." *Id.* The Court also indicated that factors such as age, race, lack of education, and gender might be relevant, although not dispositive, to determining whether a reasonable person would feel free to leave. *Id.* at 558 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

[18] D.Y. compares the instant case to *Dunaway v. New York*, 442 U.S. 200 (1979), where the United States Supreme Court held that police officers had "seized" a murder suspect when they transported him to police headquarters in a police car without probable cause to arrest him and then placed him into an interrogation room. In its opinion, the Supreme Court emphasized that investigatory stops based on *Terry* are only allowed because the "narrow intrusions" associated with investigatory stops fall "far short of the kind of intrusion associated with an arrest." *Id.* at 211. The Court reasoned that:

> In contrast to the brief and narrowly circumscribed intrusions involved in [*Terry* and its progeny], the detention of [Dunaway] was in important respects indistinguishable from a traditional arrest. [Dunaway] was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody. The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an "arrest" under state law. The mere facts that [Dunaway] was not told he was under arrest, was not "booked,"

and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, obviously do not make [Dunaway's] seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny. Indeed, any "exception" that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause.

*Id.* at 212 (internal citations omitted).

[19] Likewise, in Indiana we have found that involuntary transportation to police headquarters may be a factor in determining whether a seizure has occurred. In *Buckley v. State*, 886 N.E.2d 10, 15 (Ind. Ct. App. 2008), this Court concluded that a seizure had occurred where police officers had transported a murder suspect involuntarily to the police station and towed his car to a secure facility. *Id.* We noted that it was "not a case where a suspect voluntarily appeared at police headquarters in response to a request from investigators." *Id.* Rather, "Buckley was clearly seized in the constitutional sense when he was taken involuntarily to the police station and his car was towed." *Id.*

[20] In contrast, in *Barber v. State*, 418 N.E.2d 563 (Ind. Ct. App. 1981), we held that a police officer had not seized Barber when Barber voluntarily accompanied an officer to the police station for questioning regarding robberies in the community. There, we found it significant that:

Barber had previously been arrested twice. He testified that each time he was arrested he was told he was under arrest, handcuffed, and physically placed in the rear seat of a police car.

But when [O]fficer Sorrell drove Barber to the police station to talk to Captain Mowery, the defendant rode in the front seat of the squad car without handcuffs. Sorrell was the only officer in the automobile. The police never touched the defendant's person. Defendant Barber also knew [O]fficer Mowery and had provided him with information about a crime on a previous occasion.

[21] *Id.* at 567. Ultimately, we noted that "[w]ere it not for defendant Barber's experience with law enforcement and his relationship with Captain Mowery, we would [have been] drawn to an opposite result" and would have found that Barber had been seized. *Id.* However, based on those factors we concluded that the officers' actions did not constitute a seizure. *Id.*

[22] Similarly, in *Laster v. State*, 918 N.E.2d 428 (Ind. Ct. App. 2009), we found that a police officer's actions did not constitute a seizure. There, the officer gave Laster the option of riding with him or driving himself to the police station, and Laster opted to ride with the officer. *Id.* at 433. He rode in the front passenger seat of the police vehicle and was not restrained in any way. *Id.* Also, once he reached the station, the officer interviewed Laster in his personal office rather than an interrogation room and told him he was free to leave at any time. *Id.* We compared the officer's initial actions to those of the officer in *Faris v. State*, 901 N.E.2d 1123, 1126 (Ind. Ct. App. 2009), *trans. denied*, who allowed a suspect to drive himself to the station separately from the officer and who told the suspect that he was free to leave at any time. In both *Laster* and *Faris*, we found that the officers' actions did not lead to a seizure of their respective suspects.

[23] Although there is not a bright line standard for determining when an arrest has occurred, the above cases demonstrate that when a police officer transports a suspect to a police station, the voluntariness of the transportation may be a significant factor in determining whether a seizure has occurred. In *Buckley*, where the police involuntarily transported Buckley to the police station, we concluded that a seizure had occurred. In contrast, we found that evidence of the defendants' voluntary actions in *Barber*, *Laster*, and *Faris* demonstrated that the defendants had not been seized for purposes of the Fourth Amendment. The evidence of voluntary conduct in those cases included: a pre-existing relationship with law enforcement, a suspect riding in the front seat of the police vehicle, an officer giving a suspect the option to drive separately, and an officer telling a defendant he is free to leave at any time.

[24] Here, the State argues that Officer McDaniel merely conducted an investigatory stop and not an arrest because he intended to question D.Y. but not to take D.Y. into custody to "answer for a crime." I.C. § 35-33-1-5 ("Arrest is the taking of a person into custody, that he may be held to answer for a crime."). However, the above cases demonstrate that whether a seizure has occurred is dependent on whether a reasonable person would believe that "he [is] not free to leave," rather than the police officer's intent.

[25] Instead, when we compare the instant case to the above cases, we conclude that Officer McDaniel's actions amounted to a seizure of D.Y. Officer McDaniel did not ask D.Y. if he would accompany him to the station, and he did not give him the option to meet at the police station independently. Instead, he

explained to D.Y. "why it [was] that [he] was there and that [he] would be transporting [D.Y.] to [IMPD's] district roll call for some burglary investigation that he was a possible suspect in." (Tr. 38). Based on Officer McDaniel's language that he "would" be transporting D.Y. to district roll call, a reasonable person could have concluded that this transport was mandatory, rather than optional. (Tr. 38). This is especially true in light of D.Y.'s young age, which as the Supreme Court noted in *Mendenhall*, was a relevant factor. 446 U.S. at 558.

[26] Because D.Y. was a juvenile, there was no indication that Officer McDaniel had contacted D.Y.'s parents, and Officer McDaniel did not give any indication to D.Y. that his transportation to the police station was voluntary, we conclude that Officer McDaniel did "seize" D.Y., such that he would not have felt free to leave, even though the transportation did not occur prior to the pat down. *Id.* at 554. As the State admits that Officer McDaniel did not have probable cause or a warrant to arrest D.Y., his seizure of D.Y. violated the Fourth Amendment, and his subsequent pat down was unlawful. Officer McDaniel therefore discovered the firearm pursuant to an unlawful search, and it was inadmissible at D.Y.'s hearing. *See Clark*, 994 N.E.2d at 266 (noting that we must exclude evidence directly obtained via an illegal search). Because the firearm was an essential element of D.Y.'s charges, *see* I.C. §§ 35-47-10-5, 35-47-2-1, we reverse

and remand with instructions for the juvenile court to vacate its true findings and D.Y.'s adjudication as a delinquent child.[8] *See*

Reversed and remanded with instructions.

Barnes, J., and May, J., concur.

---

[8] Since we have found that Officer McDaniel violated D.Y.'s rights against unreasonable search and seizure under the Fourth Amendment by seizing him without probable cause, we need not address the remainder of D.Y.'s arguments.