## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 09 2016, 8:37 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Kristin A. Mulholland
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Kathrine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Morris Odis Davis, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 9, 2016 <br><br> Court of Appeals Case No. 45A03-1502-CR-64 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Salvador Vasquez, Judge <br><br> Trial Court Cause No. 45G01-1310-FB-98 |

**Riley, Judge.**

## STATEMENT OF THE CASE

[1] Appellant-Defendant, Morris Odis Davis, Jr. (Davis), appeals his conviction for carrying a handgun without a license, a Class C felony, Ind. Code §§ 35-47-2-1; -23(c)(2)(B) (2013).

[2] We reverse.

## ISSUE

[3] Davis raises one issue on appeal, which we restate as follows: Whether the trial court abused its discretion by admitting evidence that was seized pursuant to a warrantless search.

## FACTS AND PROCEDURAL HISTORY

[4] On October 16, 2013, Davis accompanied his mother to the Horseshoe Casino in Hammond, Lake County, Indiana. Davis was trying his luck on the gaming floor when he was approached by Leonard Pegues (Pegues), a man with whom Davis had a prior, unfriendly history. A verbal altercation ensued. Before the confrontation had a chance to escalate to a physical exchange, the casino's security officers responded to the disturbance and separated Davis and Pegues. Davis indicated that he was afraid of Pegues and wanted to leave the casino.

[5] In order to keep the men separated and to get both sides of the story, the casino's security supervisor, Robert Farrell (Supervisor Farrell), escorted Davis to an interview room, located in an area of the casino accessible only to employees. Davis was cooperative with Supervisor Farrell and the other

security officers as he followed them to the interview room. After Supervisor Farrell obtained some basic information from Davis, several agents from the Indiana Gaming Commission (IGC),[1] who had been summoned by security personnel at the onset of the altercation, arrived and assumed control of the investigation.

[6] IGC Agent Dennis Tracy (Agent Tracy) first spoke with Pegues. Pegues, who "was in a state of being very nervous about the situation that had just occurred[,]" informed Agent Tracy that he and Davis had previously been involved in an altercation of a violent nature. (Tr. p. 108). As a result of their prior encounter, Pegues indicated that he believed there was an active warrant for Davis' arrest. During his interview, Pegues was subjected to a pat-down search for weapons; none were found.

[7] After hearing Pegues' version of events, Agent Tracy went to the interview room to discuss the incident with Davis. Davis conceded that he had been involved in an altercation with Pegues in November of 2012; however, his account was significantly different from Pegues' report. Namely, Davis denied that his prior interaction with Pegues had been violent—*i.e.*, Davis contradicted Pegues' claim that a weapon had been utilized in the incident. Davis also

---

[1] Pursuant to Indiana Code section 4-33-4.5-1(c), "a gaming agent may act as an officer for the arrest of offenders who violate the laws of Indiana if the gaming agent reasonably believes that a crime has been, is being, or is about to be committed or attempted in the gaming agent's presence." The agent who detained Davis testified he had authority to arrest people, he wore a uniform, and he carried a gun. Conversely, the casino's security officers do not carry firearms and possess no law enforcement authority.

denied Pegues' allegation that there was a warrant out for Davis' arrest. Agent Tracy informed Davis that they were going to verify the existence of any warrant, but he found "the fact that the stories were different [to be] very disconcerting." (Tr. p. 171). Despite Davis' apparent cooperation with the IGC agents and the casino's security officers throughout the course of the inquiry into the incident on the casino floor, Agent Tracy observed that Davis "spoke very nervously. His hand gestures[] [and] his eye movement indicated to me that there may be deception going on." (Tr. p. 161). As a result, Agent Tracy asked Davis to submit to a pat-down search "for our own safety[,]" and Davis complied. (State's Exh. 1). Agent Tracy discovered a loaded .25-caliber semi-automatic handgun in the front pocket of Davis' pants. Agent Tracy removed the firearm and inquired as to whether Davis possessed a permit to carry the gun, and Davis admitted that he did not. It was eventually determined that Davis did not have an active warrant.

[8] On October 18, 2013, the State filed an Information, charging Davis with unlawful possession of a firearm by a serious violent felon, a Class B felony, I.C. § 35-47-4-5(c) (2013). The State subsequently amended the Information on April 9, 2014, and again on May 21, 2014, ultimately charging Davis with one Count of carrying a handgun without a license, a Class A misdemeanor, I.C. §§ 35-47-2-1; -23(c) (2013). The State also relied on Davis' prior felony conviction for aggravated battery against a police officer (out of Cook County, Illinois) to file an enhancement charge that would elevate Davis' crime from a Class A misdemeanor to a Class C felony. I.C. §§ 35-47-2-1; -23(c)(2)(B) (2013).

[9]     On October 30, 2013, Davis filed a motion to suppress the gun that was discovered in his possession, arguing that the pat-down search violated his rights under both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. On November 22, 2013, the trial court conducted a hearing, and on December 17, 2013, the trial court denied Davis' suppression motion. On January 15, 2014, Davis filed a motion to certify the trial court's order denying the motion to suppress for interlocutory appeal, which the trial court granted. On March 21, 2014, this court declined to accept jurisdiction for interlocutory appeal.

[10]    On August 25-26, 2014, the trial court conducted a bifurcated jury trial. Prior to the introduction of evidence, Davis renewed his motion to suppress, which the trial court again denied. At the close of the evidence, the jury returned a verdict of guilty of carrying a handgun without a permit, a Class A misdemeanor. Thereafter, Davis waived his right to have a jury hear the second phase of the trial regarding the charging enhancement, and he stipulated to the fact that he had previously been convicted of a felony. Accordingly, the trial court entered a judgment of conviction for carrying a handgun without a license as a Class C felony. On January 21, 2015, the trial court held a sentencing hearing and sentenced Davis to serve six years, with two years executed in Lake County Community Corrections and four years suspended to probation.

[11]    Davis now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[12] Davis claims that the trial court abused its discretion by admitting the gun into evidence because it was seized during the course of an unlawful search, in violation of his rights under the Fourth Amendment to the United States Constitution.[2] The admission of evidence is a matter reserved for the discretion of the trial court and is subject to reversal only if the trial court abuses that discretion. *Patterson v. State*, 958 N.E.2d 478, 482 (Ind. Ct. App. 2011). On review, our court will find that a trial court has abused its discretion "if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law." *Id.* Without reweighing the evidence, we consider any conflicting evidence in a light most favorable to the trial court's ruling and any uncontested evidence in the defendant's favor. *Id.*

[13] The Fourth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects[] against unreasonable searches and seizures." U.S. CONST. amend IV. In general, a

---

[2] Davis also generally asserts that the search was improper under Article 1, Section 11 of the Indiana Constitution, the text of which "is identical to the Fourth Amendment." *Stark v. State*, 960 N.E.2d 887, 892 (Ind. Ct. App. 2012), *trans. denied*. However, a claim under the Indiana Constitution "turns on an evaluation of the 'reasonableness' of the conduct of the law enforcement officers, not on the expectation of privacy commonly associated with Fourth Amendment analysis." *Id.* Because it is not until his reply brief that Davis sets forth the specific standard utilized in Article 1, Section 11 cases or presents a cogent argument regarding the reasonableness of the law enforcement officers' conduct, we find that he has waived his claim under the Indiana Constitution. *See* Ind. Appellate Rule 46(A)(8)(a).

search warrant is required as "a prerequisite to a constitutionally proper search and seizure." *Danner v. State*, 931 N.E.2d 421, 428 (Ind. Ct. App. 2010), *trans. denied*. In fact, warrantless searches "are per se unreasonable under the Fourth Amendment, subject to a 'few specifically established and well-delineated exceptions.'" *Patterson*, 958 N.E.2d at 482 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "As a deterrent mechanism, evidence obtained in violation of this rule is generally not admissible in a prosecution against the victim of the unlawful search or seizure." *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013) (citing *Mapp v. Ohio*, 367 U.S. 643, 649-55 (1961), *reh'g denied*). Thus, when a search or seizure is conducted in the absence of a warrant, the State bears the burden of proving that one of the well-delineated exceptions to the warrant requirement existed at the time of the search or seizure. *Danner*, 931 N.E.2d at 428.

[14] One such exception to the warrant requirement was established in *Terry v. Ohio*, 392 U.S. 1 (1968), where "the United States Supreme Court held that a police officer may briefly detain a person for investigatory purposes if, based on specific and articulable facts together with reasonable inferences drawn therefrom, an ordinarily prudent person would reasonably suspect that criminal activity was afoot." *Patterson*, 958 N.E.2d at 482. It is well established that "[r]easonable suspicion is determined on a case-by-case basis by examining the totality of the circumstances." *Id.* Along with temporary detainment for investigative purposes, *Terry* also permits a police officer to conduct a limited search of the individual's outer clothing for weapons if the officer reasonably

believes that the individual is armed and dangerous.[3] An officer's authority to perform such a pat-down search of a detained individual during a *Terry* stop is dependent upon the nature and extent of the officer's particularized concern for his or her safety.

*Id.* at 482-83 (internal citation omitted). "The purpose of this search is to allow the officer to pursue his investigation without fear for his safety or the safety of others." *Wright v. State*, 766 N.E.2d 1223, 1232 (Ind. Ct. App. 2002).

[15] Accordingly, a *Terry* stop is a lesser intrusion than an arrest, and the scope of an investigatory stop thus involves only "inquiry necessary to confirm or dispel the officer's suspicions." *Reinhart v. State*, 930 N.E.2d 42, 46 (Ind. Ct. App. 2010). Nevertheless, a *Terry* stop may transform into an arrest if it becomes so intrusive that "'it interrupts the freedom of the accused and restricts his liberty of movement.'" *Id*. (quoting *Sears v. State*, 668 N.E.2d 662, 667 (Ind. 1996)) (explaining the difference between an investigative stop and an arrest). There is no "bright line" test for evaluating whether a stop is investigatory in nature or an arrest, and we have held that "common sense and ordinary human experience must govern over rigid criteria." *Id*. In *Terry*, the United States

---

[3] The dissent finds it "significant[]" that "Agent Tracy knew that '[t]he fact that we were called down to the gambling floor itself gave us some indication that there was something serious going on. . . . [T]hat alone gave us . . . reason to believe that there was a serious event going on. . . . Accordingly, Agent Tracy conducted his pat-down search of Davis for safety reasons and discovered the firearm.'" (Slip op. at 18-19). We decline to hold that the fact that a police officer has been summoned, without more, indicates the officer is facing a "serious event" that threatens his or her safety and necessarily renders reasonable the officer's belief that he or she might be in danger and may therefore conduct a pat down search.

Supreme Court suggested that a person has been "seized," or arrested, for Fourth Amendment purposes only "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry*, 392 U.S. at 19, n.16. In *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), the Supreme Court adhered to this standard, but added that "a person has been 'seized' within the meaning of the Fourth Amendment only, if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

[16] In this case, both parties agree that *Terry* and its progeny govern the detainment and pat-down search of Davis. The record reflects that the casino's security manager, Christina Herrera (Manager Herrera), responded to a report of a "possible" fight. (Tr. p. 57). When Manager Herrera, together with two security supervisors encountered Davis on the casino floor, Manager Herrera "still didn't know at that time if anybody had been punched or anything like that." (Tr. p. 60). Davis told her "I just have to get out of here" and "I just want to go to my car," but Manager Herrera, even though she did not know whether there had been an altercation, told Davis, "No, hold on," and led Davis to "a back area that's locked." (Tr. p. 60). Manager Herrera testified that Davis "did nothing out of the ordinary" from the time she was called until he was taken to the back room. (Tr. p. 67). Manager Herrera instructed a security officer to take Davis to the interview room and to contact the Gaming Commission.

[17]     Agent Tracy was called to the gaming floor and told there was a "disturbance." (Tr. p. 106). He first spoke with Pegues and then went to talk to Davis. At that point, Agent Tracy had not seen the surveillance video or talked to any security officers who had witnessed what happened between David and Pegues. He was not aware that any criminal violation had occurred on the gaming floor. He questioned Davis in the interview room and an adjoining room.

[18]     This interview room was the last in a series of three rooms, which included a small mail room and a room that housed computers the agents used for affidavits and reports. The room Davis was taken to was "a very small odd-shaped room." (Tr. p. 111). Agent Tracy characterized it as an "interrogation room" and as the "holding room." (Tr. pp. 111, 112). Two agents and a security supervisor were in the room when Davis was interviewed. There were four or five people in the adjacent room.

[19]     Based on the facts before us, we must conclude that Davis was not *briefly* questioned on the gaming floor at the site of the altercation. *See id.* at 256 (discussing *Dunaway v. New York*, 442 U.S. 200, 212 (1979)). Instead, despite informing the security officers that he wanted to leave the casino, Davis was escorted to an area of the casino accessible only by employees and was placed in a small interview room. Furthermore, regardless of the fact that Agent Tracy stated that Davis was free to leave at any time he wished, Davis was never informed of this fact, and it appears that he could not have exited the secured area unless accompanied by an IGC agent or casino employee. Thus, we do not find that a reasonable person in Davis' position would have felt that he was

free to leave. Rather, it is clear that Davis' situation fell outside the boundaries of a *Terry* stop and amounted to an arrest as his liberty was restrained. *See, e.g.*, *D.Y. v. State*, 28 N.E.3d 249, 255 (Ind. Ct. App. 2015).

[20] Because the officers did not have a warrant for Davis' arrest, the pat-down search was impermissible unless there was probable cause for the search. *See, e.g. Bell v. State*, 13 N.E.3d 543, 545 (Ind. Ct. App. 2014) ("a patdown search would have been permissible only if Officer Phillips had probable cause to arrest Bell."), *trans. denied*. There is probable cause to search when the facts and circumstances within the knowledge of the officer making the search, based on reasonably trustworthy information, are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed. *Clark v. State*, 808 N.E.2d 1183, 1192 (Ind. 2004). The amount of evidence necessary to meet the probable cause requirement is determined on a case-by-case basis. *Decker v. State*, 19 N.E.3d 368, 376-77 (Ind. Ct. App. 2014), *trans. denied*. Whether there is probable cause is a fact-sensitive determination. *Id*. It is grounded in notions of common sense, not mathematical precision. *Id*. The evidence required to establish guilt is not necessary for probable cause for an arrest. *Id*.

[21] In the present case, although Agent Tracy acknowledged that Davis and Pegues had given consistent stories regarding the disturbance on the casino floor, he offered as a basis for conducting the pat down his concern that Davis and Pegues provided contradictory narratives as to their prior history. More specifically, Agent Tracy noted that Davis "spoke very nervously" during his

interview, and "[t]he fact that [Davis] did not make eye contact" indicated to Agent Tracy "that there may be deception going on." (Tr. pp. 160-61). According to Agent Tracy:

> My [thirty-one] years of law enforcement experience has taught me that when you have two individuals that are both nervous and excited about something that's going on and you have different type stories of what was going on out there, you—you want to—you want to make sure that the environment is safe and you want to make sure that the stories you're getting are correct. So the first thing that I always think about is safety. And, again, this room was very small. At the time there were four agents—or four people in this room. Outside into the—in the second room there was another four or five people. So as being the lead agent—I would say not by rank but only by experience—I wanted to make sure that the situation was safe, that everyone in the room I felt was my responsibility to make sure that they were continuing to be safe.

(Tr. pp. 117-18).

[22] Here, however, other than believing that Davis' lack of eye contact indicated possible deception, Agent Tracy did not testify how this behavior suggested that Davis was armed and dangerous and was committing an offense. *See, e.g., Pace v. Beto*, 469 F.2d 1389, 1390 (5th Cir. 1972) ("Pace's nervous conduct is not surprising in view of the fact that he had just been arrested, and such conduct by itself could not give rise to probable cause to believe that he had committed any offense other than the traffic violation."). Moreover, the fact that Agent Tracy may have questioned the veracity of Davis' account of an event that had occurred with Pegues nearly a year earlier is not an articulation of a specific fact

from which it could be inferred that Davis was armed and dangerous at the point in time immediately preceding the search. In fact, other than to state that "[i]t was the totality of all the circumstances together that just made me feel unsecure and unsafe[,]" including the fact that Pegues had indicated that there was a an active warrant for Davis' arrest—which later proved to be untrue—Agent Tracy never indicated that he believed, or had reason to believe, that Davis was concealing a firearm on his person. (Tr. p. 182).

[23] Agent Tracy further explained:

> [t]he fact that we were called down to the gambling floor itself gave us some indication that there was something serious going on. Because the security department does not call us down for just any reason. So that alone gave us some—some reason to believe that there was a serious event going on.

(Tr. p. 106). Yet, when the IGC agents arrived to the gaming floor, the situation between Davis and Pegues had already been defused, and IGC agents did not deem it necessary to immediately search Davis or Pegues. Rather, it was not until well after the men had been separated and had provided differing accounts of their prior history that Agent Tracy determined that "the volatility of the situation" necessitated a search. (Tr. p. 119). Once again, except for a general assertion of volatility, Agent Tracy did not testify to facts that would support a reasonable, objective belief that Davis was armed and dangerous.

[24] Instead, Agent Tracy testified that Davis had not, to Agent Tracy's knowledge, committed any criminal offenses while on the casino floor, and Davis was

cooperative during his interview. Davis did not display any aggressive or furtive behaviors in the IGC agents' presence. Furthermore, Davis was not handcuffed, and the IGC agents were never prompted to draw their own weapons in response to any actions taken by Davis. Accordingly, based on the facts before us, we conclude that Davis' seizure amounted to an arrest which was unsupported by probable cause. As such, the search was impermissible and any evidence resulting from this illegal search has been improperly admitted.

## CONCLUSION

Based on the foregoing, we conclude that the trial court abused its discretion by admitting the gun into evidence because Davis' detainment amounted to an arrest unsupported by probable cause.

Reversed.

May, J. concurs

Najam, J. dissents with separate opinion

# IN THE
# COURT OF APPEALS OF INDIANA

Morris Odis Davis, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

Court of Appeals Case No.
45A03-1502-CR-64

**Najam, Judge, dissenting.**

[29] I respectfully dissent from the majority's conclusion that the trial court abused its discretion in the admission of evidence, and I would affirm the trial court's judgment and Davis' conviction.

[30] As an initial matter, I cannot agree with the majority's *sua sponte* analysis that officers unlawfully arrested Davis. Davis did not object in the trial court on the grounds that he had been unlawfully arrested, and even if he had briefed that issue on appeal it is axiomatic that "[a] defendant may not raise one ground for objection at trial and argue a different ground on appeal." *Small v. State*, 736

N.E.2d 742, 747 (Ind. 2000). Whether Davis' counsel had good reason not to argue that the officers arrested him when they escorted a person apparently involved in a fight in a public area away from that fight and away from the public generally, when that person ran to them asking for assistance and voluntarily followed the officers when they offered their assistance, is a question I would leave for post-conviction review.

[31] Because the majority concludes that the officers arrested Davis, the majority likewise concludes that Agent Terry needed probable cause to conduct the ensuing pat-down search. Again, this is at odds with Davis' argument in the trial court and on appeal, in which he asserted not that Agent Terry lacked probable cause but instead that Agent Terry failed to meet the lower burden of having had a reasonable and articulable suspicion to conduct the pat-down search. For the same reasons I cannot agree with the majority's analysis that officers arrested Davis, I cannot agree with the majority's *sua sponte* analysis that Agent Terry lacked probable cause to conduct the pat-down search.

[32] Considering only Davis' actual argument on appeal, I would hold that the trial court did not abuse its discretion when it admitted the evidence seized from the pat-down of Davis' person. As our supreme court has explained:

> Generally, a trial court's ruling on the admission of evidence is accorded a great deal of deference on appeal. Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion and only reverse if a ruling is clearly against the logic

> and effect of the facts and circumstances and the error affects a party's substantial rights.

*Hall v. State*, 36 N.E.3d 459, 467 (Ind. 2015) (citations and quotation marks omitted). Here, the parties agree that whether the pat-down search was lawful turns on whether Agent Terry had a reasonable and articulable suspicion to conduct the pat-down search.

[33] "An officer's authority to conduct a pat-down search is dependent upon the nature and extent of his particularized concern for his safety and that of others." *Wilson v. State*, 745 N.E.2d 789, 792 (Ind. 2001). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). In turn, this consideration requires that "due weight be given, not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.*

[34] "The United States Supreme Court has held that nervous and evasive behavior is a pertinent factor in determining whether reasonable suspicion exists" to conduct a pat-down search. *Howard v. State*, 862 N.E.2d 1208, 1210-11 (Ind. Ct. App. 2007) (citing *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984)). This court has likewise held that, where a defendant "became very nervous and fidgeted . . . as if trying to hide or retrieve something" upon an officer's approach, "[t]he officer's belief [that he might be in danger and] patdown search for weapons[]

were reasonable under the circumstances." *Trigg v. State*, 725 N.E.2d 446, 449 (Ind. Ct. App. 2000).

[35]     I cannot say that the trial court erred when it concluded that a reasonably prudent person in Agent Tracy's circumstances would have been warranted in the belief that his or another's safety was in danger prior to the pat-down search. Immediately upon arriving on the casino floor, Agent Tracy met with Pegues and observed that Pegues was "very irate," "nervous," "afraid," "sweating," and "walking all over the place." Tr. at 161. Pegues stated that he and Davis had had a "violent" encounter about one year prior. *Id.* at 170. Agent Tracy then met with Davis. Agent Tracy immediately learned that Davis did not have identification on him while at the casino, which Agent Tracy, through his experience, believed to be "a problem" indicating "evasiveness." *Id.* at 155, 169. Agent Tracy observed that Davis "spoke very nervously," and Agent Tracy knew from his experience that Davis' "hand gestures" and "eye movement indicated . . . deception." *Id.* at 161. Upon telling Davis that Pegues had reported a previously violent encounter with Davis, Agent Tracy listened as Davis told a "different story," which Agent Tracy found "disconcerting," and Agent Tracy observed that Davis kept his "arms crossed," which Agent Tracy recognized as "defensive body language" that suggested "deception" and "evasi[on]." *Id.* at 170-71, 177-78, 182. And, significantly, Agent Tracy knew that "[t]he fact that we were called down to the gambling floor itself gave us some indication that there was something serious going on. . . . [T]hat alone gave us . . . reason to believe that there was a serious event going on." *Id.* at

160. Accordingly, Agent Tracy conducted his pat-down search of Davis for safety reasons and discovered the firearm.

[36]   Agent Tracy's pat-down search relied on numerous specific and articulable concerns recognized by Agent Tracy prior to the search.[4] These concerns included not just permissible inferences from Davis' "nervous and evasive behavior" but also the immediately preceding, "serious" physical altercation and Agent Tracy's knowledge of a prior "violent" physical incident between Davis and Pegues. *Howard*, 662 N.E.2d at 1210-11; *Trigg*, 725 N.E.2d at 449. Agent Tracy was entitled to use his experience to guide his judgment, and we are required to give that assessment its due weight. *Terry*, 392 U.S. at 27. A reasonably prudent person in Agent Tracy's circumstances would have been warranted in his belief that his or another's safety may have been in danger, which satisfies the Fourth Amendment's requirement for a lawful pat-down search.[5]

[37]   Accordingly, I would affirm the trial court's admission of the evidence and Davis' conviction.

---

[4] The majority criticizes Agent Tracy for waiting to conduct the pat-down until "well after the men had been separated." Slip op. at 13. But it is not clear from the record exactly how much time had passed between separating the men and the pat-down. And, in any event, Davis cites no law that requires a pat-down at an officer's first opportunity. To the contrary, it was prudent, if not constitutionally required, of Agent Tracy to wait until he had a well-developed, articulable basis for the pat-down before he conducted it.

[5] I agree with the majority that Davis has not properly raised any claims under Article 1, Section 11 of the Indiana Constitution.