**James SEARS, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 49S00–9407–CR–608.

Supreme Court of Indiana.

July 9, 1996.

⊙═5

S. Sargent Visher, Indianapolis, for Appellant.

Pamela Carter, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Appellee.

## ON DIRECT APPEAL

SULLIVAN, Justice.

On September 14, 1992, defendant James Sears was charged with two counts of Murder[1], Attempted Murder[2] (Class A felony), Robbery[3] (Class A felony), Attempted Robbery[4] (Class A felony), Kidnapping[5] (Class A felony), and Carrying a Handgun Without a License[6] (Class A misdemeanor). On January 27, 1994, the jury found defendant guilty of all charges. Upon sentencing, the trial court merged the two murder convictions and sentenced the defendant to consecutive terms of imprisonment of 60 years for Murder, 50 years for Attempted Murder, 20 years for Robbery, 20 years for Attempted Robbery, and 50 years for Kidnapping. Defendant was also sentenced to one year for Carrying a Handgun Without a License, to be served concurrent to the sentence for murder. Pursuant to Rule 4(A)(7) of Indiana Appellate Procedure, defendant then directly appealed his convictions to this court. We Affirm.

### Background

On September 13, 1992, defendant approached Wilbur Colen, Jon Bewley and Joe Shevenell who were playing golf at the Coffin golf course in Indianapolis. Defendant robbed Shevenell at gunpoint. He then approached Bewley. When Bewley told defendant that he did not carry his wallet with him while he was golfing, defendant became angry. Then, while defendant was distracted by Colen, Bewley tried to get the gun from the defendant and a struggle took place.

1. Ind.Code § 35–42–1–1 (1992 Supp.).

2. Ind.Code §§ 35–41–5–1 (1993), 35–42–1–1 (1992 Supp.).

3. Ind.Code § 35–42–5–1 (1993).

4. Ind.Code §§ 35–41–5–1, 35–42–5–1 (1993).

5. Ind.Code § 35–42–3–2 (1993).

6. Ind.Code §§ 35–47–2–1, 35–47–2–23 (1993).

During the struggle, Bewley knocked the gun from defendant's hand. It was after this struggle that defendant picked up the gun and shot Colen, killing him.

Soon after the shooting, defendant telephoned Jamie Swanson, his ex-girlfriend and mother of his son, who lived near the golf course. Defendant told her that he wanted to see their son and they agreed to go out to dinner that evening. After dinner, Swanson began driving north away from town. As they drove, defendant began to talk about starting a new life. He also stated that he was wanted by the police. When Swanson asked him what he meant, he told her that he was responsible for the shooting at the golf course. Upon hearing this, Swanson tried to turn around and go home, but defendant pulled out a gun and told her to keep driving. Soon after this, defendant made Swanson switch seats with him so he could drive. While switching seats defendant made Swanson stay inside the car and slide over to the passenger side. At one point as defendant drove, he said that he would shoot Swanson because she wasn't letting him see his son.

In an effort to get help, Swanson told defendant that the baby needed milk and suggested they stop at a fast food restaurant in Pendleton. When they got to the restaurant, Swanson told defendant that she needed to use the rest room and he followed her into the restaurant and waited outside the rest room. While Swanson was in the rest room, a teenage girl came in and Swanson asked the girl for help. Swanson told the girl to call the police or have the manager call the police because her ex-boyfriend had kidnapped her and her son. When Swanson came out of the rest room, she told defendant that they needed to warm the milk and suggested that they go across the street to a gas station/convenience store. While Swanson waited in the car, defendant went into the store part of the gas station and warmed the milk. As he came out and got back into the car, the police arrived. After several searches, to be discussed in greater detail below, the police arrested defendant and took him back to the Madison County jail. Soon after that, they transferred defendant to the

Marion County jail where he was charged with murder.

## Discussion

Defendant presents four issues on review: (i) whether it was error to admit evidence seized from defendant's person without a warrant; (ii) whether it was error for the trial court to permit the use of a statement defendant made to the media; (iii) whether the judgment that the defendant committed the crime of kidnapping was error due to insufficient evidence and improper jury instructions; and (iv) whether the 200 year sentence was extreme and disproportionate to the offenses committed.

### I

Officer Moore of the Pendleton Police Department and Deputy Morgan of the Madison County Sheriff's Department had responded to a report of "a man with a gun holding a female against her will." The police had originally gone to the restaurant across the street, and saw no one matching the description they had received. The officers then saw defendant across the street at the gas station/convenience store. They approached the car and asked if defendant had been at the restaurant across the street. Swanson made eye contact with them and asked for help. The officers had defendant step out of the car and they put him in handcuffs. While Officer Moore patted down defendant outside the car, Deputy Morgan talked to Swanson in her car. During this initial search of defendant, Officer Moore found nothing.

While Officer Moore was patting down defendant, Swanson told Deputy Morgan that defendant had a weapon. Deputy Morgan then related this information to Officer Moore who conducted a second pat down search of defendant. This second search revealed a gun in the pouch of defendant's jacket. Officer Moore asked defendant if he had a license to carry the weapon, and he said that he did but that it was at home. Officer Moore then placed defendant in the patrol car. At this time defendant also gave his name as James Jones and gave a birth

666

date and Social Security number to Officer Moore.

Officer Moore radioed a request for a warrant check on James Jones using the birth date and Social Security number he had been provided by defendant. While waiting for the response, Officer Moore consulted with Deputy Morgan. Deputy Morgan gave Officer Moore additional information provided by Swanson: that the subject's name was James Sears, and he had a slightly different birth date and Social Security number. She also said that defendant had been involved in a homicide in Indianapolis. It was at that point that Officer Moore conducted the third search. Officer Moore checked defendant's pockets more thoroughly and found a check stub and a driver's license belonging to a Mr. Shevenell.

Officer Moore then radioed back to the state police to find out if they had any information on a Mr. Sears or a Mr. Jones. After a time, Officer Moore was told that there was an active traffic warrant for Sears and that there was no handgun permit issued to a person named Sears with the corresponding information. Officer Moore then read defendant his *Miranda* rights and transported him to the Madison County jail.

■ Defendant contends that the trial court improperly admitted the Shevenell driver's license and check stub into evidence.[7] His theory is that these items were the product of a warrantless search. Citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and *Murrell v. State*, 421 N.E.2d 638 (Ind. 1981), defendant accurately states that a warrantless search is *per se* unreasonable and the state bears the burden of establishing that the warrantless search falls within an exception to the warrant requirement.

We believe the state easily met that burden here. The trial court overruled the mo-

tion to suppress the use at trial of the driver's license and the check stub based on grounds that defendant was searched incident to a valid arrest. The judge explained his denial of the motion to suppress as follows:

I think that the police had reason to initially detain him; and, after detaining him, developed probable cause to believe that he may have committed a felony. After that probable cause was developed and he was placed in handcuffs, he was certainly taken or seized to answer for a crime. And, being handcuffed, I certainly think that indicates facts and circumstances communicating to Mr. Sears that he was under arrest and was not free to leave by police officers who had the authority to make that—make that arrest. During the course of their investigation they found a weapon. No license to possess that weapon was discovered. I think that they had probable cause at that time—further probable cause—to make an arrest for carrying a handgun without a license. And, all subsequent pat-downs or searches of Mr. Sears person were as a result of that lawful arrest for carrying a handgun without a license. So, for those reasons, at this time I would deny the Motion to suppress.

■ As with many search cases and probable cause issues, the timing of events and the officer's knowledge are critical in determining the validity of the search. It is well established that the police can search without a warrant if it is incident to a valid arrest. *Illinois v. Rodriguez*, 497 U.S. 177, 185, 110 S.Ct. 2793, 2799–800, 111 L.Ed.2d 148 (1990); *Hill v. California*, 401 U.S. 797, 803–804, 91 S.Ct. 1106, 1110–1111, 28 L.Ed.2d 484 (1971); *Townsend v. State*, 460 N.E.2d 139, 141 (Ind. 1984). It is equally well settled that a police officer may arrest a suspect without a warrant if that officer has

7. Defendant does not appear to contest the legality of the first two searches, *i.e.*, the "patdowns" which produced nothing in the first instance and the handgun in the second, suggesting that these were permissible frisks under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), as searches for weapons. Appellant's brief at 19. In any event, defendant does not contend that because he was already in handcuffs at the time

of these two searches, the searches were incident to an arrest and probable cause was required. *Underwood v. State*, 644 N.E.2d 108 (Ind.1994). However, even if we were to conclude that these searches were not valid pursuant to *Terry*, we likely would conclude that probable cause existed to support defendant's seizure based on the facts known to the police at the time defendant was handcuffed.

probable cause to believe that the suspect has committed a felony. *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985); *United States v. Watson*, 423 U.S. 411, 417, 96 S.Ct. 820, 824–825, 46 L.Ed.2d 598 (1976); *Carroll v. United States*, 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925); *Bergfeld v. State*, 531 N.E.2d 486, 489 (Ind. 1988). Probable cause exists when, at the time of the arrest, the arresting officer has knowledge of facts and circumstances which would warrant a man of reasonable caution to believe that the defendant committed the criminal act in question. *Green v. State*, 461 N.E.2d 108, 112 (Ind. 1984).[8]

In this case, the police officers knew the following facts before the search at issue here: (i) they had received a call from dispatch of a woman being held against her will with a handgun; (ii) they were advised as to the suspect's clothing; (iii) they found only one person meeting the description they were given and he was near the place to which the call had originally directed them; (iv) when they confronted defendant, Swanson made eye contact and nodded to them when they said they were investigating a call about a problem at the restaurant across the street; (v) Swanson stated that defendant had a weapon; (vi) the police found a gun but no permit; (vii) defendant gave them a name, birth date and Social Security number that did not match what Swanson had told them; and (viii) Swanson told them that defendant had been involved in a shooting in Indianapolis that day.[9] We believe these facts would warrant a person of reasonable caution to believe that defendant at a minimum committed the felony of criminal confinement.[10]

Having found probable cause sufficient to justify an arrest, we move to consider whether an arrest actually occurred prior to the search at issue. In this regard, the defendant contends that an arrest did not take place until after the search so the search could not have been justified on the basis of a search incident to a lawful arrest.

It has long been held that an arrest occurs when a police officer interrupts the freedom of the accused an restricts his liberty of movement. *Roberts v. State*, 599 N.E.2d at 598; and *Armstrong v. State*, 429 N.E.2d 647, 651 (Ind. 1982). In addition, an intent to arrest may be drawn from attendant circumstances and need not be expressly announced if it would be idle ceremony to do so. *Gilman v. State*, 180 Ind.App. 483, 389 N.E.2d 327, 331 (1979).

Based on this established law, it is evident defendant was arrested prior to the search. The police had put defendant in handcuffs and placed him in the back of their patrol car. This action clearly interrupted the freedom of defendant and restricted his liberty of movement. This left no doubt that defendant was not free to go.

Defendant was under arrest pursuant to probable cause. A search may be conducted without a warrant if it is *incident* to a lawful arrest. *Townsend v. State*, 460 N.E.2d 139, 141 (Ind. 1984). To be incidental to a lawful arrest, the search must be conducted substantially contemporaneous with the arrest and be confined to the immediate vicinity of the arrest. *Id.* Those standards were met here; the driver's license and

**8.** Ind.Code § 35–42–3–3 (1993). The police officer's actual knowledge of objective facts and circumstances is determinative; probable cause to arrest may exist even though a police officer's subjective evaluation leads the officer to conclude that the officer did not have enough information to establish probable cause at that particular time. *Roberts v. State*, 599 N.E.2d 595, 598 (Ind.1992).

**9.** The uncorroborated statements of a crime victim may furnish probable cause to obtain an arrest warrant and also provide the probable cause necessary for a warrantless arrest. *Borkholder v. State*, 544 N.E.2d 571, 575–576 (Ind.Ct. App.1989). Because there was no reason to believe that Swanson was not telling them the truth, the police could accept as true her statements as to defendant's weapon possession, identity, and involvement in a shooting earlier that day.

**10.** Our conclusion is not affected by the fact that defendant was not ultimately charged with criminal confinement. The facts and circumstances of which the arresting officer has knowledge that provide probable cause to believe a crime has been committed need not relate to the same crime with which the defendant is ultimately charged. *Moody v. State*, 448 N.E.2d 660, 663 (Ind.1983).

check stub were properly admitted by the trial court.

## II

Shortly after being transported to the Marion County jail, defendant granted interviews to three television stations. Over objection, a videotape of one of these interviews was played at trial. Defendant contends that the trial court should not have permitted the videotape to be used for essentially three separate reasons: he was tricked into giving the interviews; the interviews violated his *Miranda* rights; and that as a matter of judicial administration policy, newly arrested persons should be protected from the overwhelming power of the media.

There are two versions of the events leading up to the television interviews. Defendant's claim is that, while locked in a cell, he was awakened by a deputy sheriff and asked if he wanted to be on the news. Defendant says that he refused, after which the deputy asked defendant to sign a statement confirming that he did not want to be interviewed on the news. Defendant says he signed the statement without reading it, at which point the officer escorted him out of his cell and into a room where a camera and interview site were set up. Defendant gave a total of three interviews and says he did so because he felt that he was not free to leave.

The police version is that one television station asked to speak with defendant. The police then, according to policy, asked defendant if he wanted to talk to the news reporters. When the defendant said that he would, the police had defendant read a release form and sign it. The interview was conducted and an officer remained present for security reasons. After that interview was over, two more stations called and asked for interviews which were also granted by defendant.

In reviewing a trial court's ruling on a motion to suppress, we will not reweigh the evidence, but will look to the evidence most favorable to the ruling and any uncontested adverse evidence. *Roberts v. State,* 599 N.E.2d at 597. Defendant's claim that he was tricked or coerced by the police asks that we reweigh the evidence. There was sufficient evidence to support the trial court's ruling on this point.

Defendant also claims that the media was acting as an agent for the police and that as such, he should have been given a statement of his rights as required under *Miranda.* Since it is uncontested that defendant was not given a statement of his rights at this time, defendant claims that his statements given during the interviews should be suppressed according to the *Miranda* doctrine and the exclusionary rule.

The *Miranda* rules apply in situations where there is police interrogation and custody. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The purpose of *Miranda* is to dispel the inherently coercive effect of police custody and interrogation. *Id.* at 467, 86 S.Ct. at 1624. Based on this rationale, it has also been held to apply to police custody and the functional equivalent of interrogation by the police. *Rhode Island v. Innis,* 446 U.S. 291, 301–302, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297 (1980); *Robey v. State,* 555 N.E.2d 145, 148 (Ind. 1990). The police also cannot avoid their duty under *Miranda* by attempting to have someone act as their agent in order to bypass the *Miranda* requirements. *See Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *Smith v. State,* 465 N.E.2d 1105, 1122 (Ind. 1984), *cert. denied* —— U.S. ——, 114 S.Ct. 1634, 128 L.Ed.2d 357 (1994); *Turner v. State,* 273 Ind. 627, 407 N.E.2d 235, 239 (1980). This is what defendant claims occurred here. This concept of whether *Miranda* warnings are required because the person conducting the interrogation is an agent of the state has been examined in several contexts,[11] including media inter-

11. *See e.g., Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) *(Miranda* warnings required prior to defendant's interrogation by state's psychiatrist in capital case); *Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990)(*Miranda* warnings not required for a prisoner speaking to an undercover police officer in prison); *Gregory v. State,* 540 N.E.2d 585 (Ind.1989)(*Miranda* warnings not applicable to conversations between a prisoner and his parents while in the

views. In *Resnover v. State,* 460 N.E.2d 922 (Ind.1984), *cert. denied* 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160 (1984), the defendant argued that it was error for the trial court to admit certain incriminating statements made by the defendant to a newspaper reporter who interviewed the defendant in jail at the defendant's request. We rejected defendant's claims that this testimony violated his Sixth Amendment right to assistance of counsel because the reporter was not directed or encouraged by the state to act as its agent and did not misrepresent his status as a reporter to the defendant. *Resnover,* 460 N.E.2d at 932. In *Lipps v. State,* 254 Ind. 141, 258 N.E.2d 622 (1970), defendant made precisely the same claim as that of defendant in this case, *i.e.,* that it was reversible error to allow incriminating statements made by defendant to a newspaper reporter since the defendant had not been advised of his *Miranda* rights prior to meeting with the reporter. We said that "while it is conceivable that in a given situation a third person may be acting as an agent for the police, in which case a *Miranda* warning would conceivably be required, the evidence in the case at bar does not support the conclusion that Johnson was acting as an agent for the police." *Lipps,* 258 N.E.2d at 627.

Similar results were also rendered in two California decisions cited by the defendant. In *People v. Price,* 63 Cal.2d 370, 46 Cal. Rptr. 775, 406 P.2d 55 (1965), defendant challenged the admissibility of several statements given to a television news reporter who had obtained permission to conduct the interview from the police officer supervising the defendant's detention. The court rejected defendant's claim, concluding that the only connection between the state and the interview was the granting of the initial interview request and that "absent evidence of police complicity, the admission of defendant's statement to the reporter infringed no constitutional right." *Price,* 46 Cal.Rptr. at 781, 406 P.2d at 61. The California Supreme Court also addressed the issue in *People v. Massie,* 66 Cal.2d 899, 59 Cal.Rptr. 733, 428 P.2d 869 (1967). Again defendant claimed reversible error in the admission of television presence of police officers at a jail after an arrest).

news film of a confession that he had given to a reporter. The court held for the state, noting that the defendant had failed to introduce any "evidence of compulsion or police complicity in staging [the interview]." *Massie,* 66 Cal.2d at 909, 59 Cal.Rptr. at 740, 428 P.2d at 876.

There must be some evidence of an agency relationship between the media and the police in order to conclude that the media was acting as an agent for the police. In this case there was no official interrogation by any police officer and the media was never acting on any requests by the police to ask certain questions or in any way influence the actual subject matter of the interviews. There is no indication that once defendant consented to the interview, the police did any more than provide a secure place to have the media conduct the interviews. The police presence was only for protection and was to be entirely expected for someone who was charged with Murder and Kidnapping. There is no evidence that the police had any hand in orchestrating the questions that were asked or in any other way controlling the interviewers. Under these facts we conclude that the media was not acting as an agent for the police, and therefore should be treated as any other private citizen who conducts an interview with a defendant.

Once it is determined that the media was not acting as an agent for the police, it is a simple matter to apply the *Miranda* doctrine. Since there was no police interrogation and the media was not acting as an agent for the police, the *Miranda* warnings were not required.

■ Lastly, defendant calls upon us to exercise our judicial administration responsibilities to grant the "newly arrested newsworthy" protection from the overwhelming power of the media. Specifically, defendant argues in his brief:

> This case poses an extraordinary opportunity for Indiana—one of the few states which does not permit cameras in the courtroom—to our immense credit in these days of the *People v. Simpson* spectacle—to articulate a rule of firm guidance in

limitation for the media and law enforcement which will prevent the mob from entering the jail by means of the media and will protect the accused from its overwhelming power. A rule which banned such interviews altogether would seem to infringe upon the right of access to the media. Instead, Sears suggests a rule with some control, requiring, at a minimum, that no such interview be permitted until and unless counsel has approved, no matter how dogged the entreaties of the media for access to the newly arrested newsworthy, and that no such interview be used as evidence unless this test be met. Our obligation to protect the delicate mechanism that is our scheme of justice requires such a rule.

Appellant's brief at 31–32. We decline defendant's invitation.

We conclude that the trial court properly admitted the videotaped interviews that defendant gave to the news media.

### III

Defendant challenges his conviction for kidnapping both on grounds that the evidence was insufficient to support it and that the jury had been improperly instructed on the element of "hijacking." In order to obtain a conviction on the kidnapping count, the state was required to prove beyond a reasonable doubt that defendant (i) while armed with a handgun, (ii) unlawfully and knowingly confined Swanson without her consent, (iii) by the act of or conduct forcing her to remain inside the car, (iv) while he hijacked the car. The trial court defined "hijacking" in its instruction to the jury as "the exercising of unlawful or unauthorized control of a vehicle by force or threat of force upon the vehicle's inhabitant." Defendant objected to the instruction at trial but gave no basis for the objection nor tendered an instruction of his own. Accordingly, his claim is waived. *Priestley v. State*, 451 N.E.2d 88 (Ind.Ct.App.1983). On the merits, the instruction tracks exactly the language of *Wilson v. State*, 468 N.E.2d 1375, 1378 (Ind. 1984). The jury was properly instructed on the element of hijacking.

As to defendant's sufficiency of the evidence claim, it appears to focus on defendant's contention that Swanson voluntarily accompanied defendant. "[W]hat happened here seems more a drawn out quarrel on wheels than a hijacking." Appellant's brief at p. 33. In reviewing sufficiency questions, this court does not weigh the evidence or determine the credibility of witnesses, but considers only the evidence most favorable to the verdict and to all reasonable inferences therefrom. *Arndt v. State*, 642 N.E.2d 224, 229 (Ind.1994). If there is evidence of probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt, the conviction will be affirmed. *Id.* Swanson testified that sometime between leaving Indianapolis and reaching Pendleton, she wanted to turn off and go back home but defendant pulled out the gun and told her to keep on driving. This was evidence that defendant was armed and that he was exercising unlawful or unauthorized control of a vehicle by threat of force upon the vehicle's inhabitants. Swanson further testified that on one occasion she tried to turn the steering wheel towards home and defendant pushed the wheel the other way. Later, they switched seats and defendant would not let her get out of the car. He thus confined her by forcing her to remain inside the vehicle. As such, there was probative evidence on every element of the kidnapping charge.

### IV

Defendant challenges the 200–year sentence as extreme in length and form in that it was disproportionate and inappropriate to the offense and the offender. While acknowledging that the consecutive maximum offenses for each of the murder, attempted murder, robbery and kidnapping convictions are authorized by statute, defendant contends that they are unconstitutional as they amount to cruel, unusual, and disproportionate punishment.

Here the defendant killed one man, robbed another at gunpoint, and pulled the trigger while struggling with the third. The gun didn't go off only because Bewley caught the hammer. Defendant then kidnapped a fourth victim using the same gun. Thus four

separate victims were subjected to four violent felonies. The sentences were authorized by statute and the trial court set forth on the record sufficient aggravating circumstances to justify their enhancement to the maximum amount. *Harris v. State,* 659 N.E.2d 522, 527 (Ind.1995). Under these circumstances we cannot conclude that the sentence here was cruel, unusual, or disproportionate.

### Conclusion

The defendant's convictions and sentence are affirmed.

SHEPARD, C.J., and DeBRULER, DICKSON and SELBY, JJ., concur.