## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 26 2018, 6:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Michael C. Borschel<br>Indianapolis, Indiana | Curtis T. Hill, Jr.<br>Attorney General of Indiana |
| | James B. Martin<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Frank Dangerfield,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | June 26, 2018<br><br>Court of Appeals Case No.<br>49A05-1711-CR-2544<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Alicia A. Gooden, Judge<br><br>Trial Court Cause No.<br>49G21-1604-F2-14201 |

**Brown, Judge.**

[1] Frank Dangerfield appeals his conviction for dealing in a narcotic drug as a level 2 felony and the enhancement of his sentence pursuant to an adjudication that he is an habitual offender. Dangerfield raises one issue which we revise and restate as whether the court abused its discretion by admitting evidence obtained as a result of Dangerfield's arrest. We affirm.

## Facts and Procedural History

[2] Detective Scott Wolfe of the Indianapolis Metropolitan Police Department ("IMPD") was assigned to the Metro Drug Task Force and began an investigation into an individual who would eventually be identified as Dangerfield sometime in the spring of 2016. Between March 7 and March 9, 2016, police arranged a controlled purchase of heroin through a confidential informant ("CI") with whom working had "led to the seizure of drugs in the past as well as the arrest and conviction of people for drug crimes." Transcript Volume 2 at 16. After being "set up . . . with . . . recording equipment" and being provided with "pre-recorded IMPD buy money," the CI traveled to a pre-determined location established with the individual later identified as Dangerfield and purchased what was later tested to be heroin. *Id.* at 17. Following the purchase, the CI met with Detective Wolfe and gave him the heroin. Detective Wolfe reviewed video obtained by the CI and identified the person who sold the heroin as Dangerfield, someone who had grown up in the area that Detective Wolfe had originally patrolled and who had been arrested by him in the past.

[3] In preparation for a second controlled purchase which was also conducted in March 2016, Detective Wolfe researched Dangerfield and discovered that he was on home detention and obtained the details of his home detention. Surveillance units monitored Dangerfield's residence. Once the second controlled purchase commenced, detectives reported to Detective Wolfe that they observed Dangerfield exit the residence, enter a vehicle, and head to meet the CI at the arranged location. Similar to the first controlled purchase, the CI was provided pre-recorded money. Audio and video surveillance was collected on the purchase which further "demonstrated that [it] was in fact [Dangerfield] that was conducting [the purchase]." *Id.* at 22. Officers met with the CI after the purchase and recovered the suspected heroin, which later tested positive.

[4] Detective Wolfe coordinated a third controlled purchase in April 2016, where the CI placed a telephone call to Dangerfield and the same procedure was followed with regards to the CI being provided purchase money. The purchase was also captured on audio and video recording and the CI brought the acquired substance to officers after meeting with Dangerfield, which also tested positive for heroin. During the third purchase, Dangerfield was driving a "sort of a greenish-grey Chrysler 300." *Id.* at 23.

[5] On April 13, 2016, officers from the Metro Drug Task Force arrived at Dangerfield's residence, intending to "[m]ake an outright arrest." *Id.* at 24. As they arrived, they parked away from the residence. Dangerfield exited the house with his wife and walked to a green Chrysler 300 parked in the driveway. Officers identified Dangerfield, drove "right up in the driveway," exited their

vehicles and moved towards the house as Dangerfield approached the Chrysler, identified themselves as police officers, and told Dangerfield "at that time" to place his hands in the air. *Id.* at 77, 110. Dangerfield responded by backing away toward the garage and moved to the front bumper of the Chrysler, which faced the garage. He then reached into the front part of his blue jeans, ducked down, and placed a "clear plastic baggie with a grayish substance" on the ground that was recognized by Detective Wolfe as "suspected heroin." *Id.* at 77, 81. After starting to stand, Dangerfield reached again into his waistband, and removed and placed a "little over forty-seven hundred dollars" "made mainly of twenties" on the hood of the car. *Id.* at 81. An officer placed Dangerfield in handcuffs, moved him into the front yard of the residence, patted him down, checked his pockets, and located an additional bag of heroin, two cellular phones, a lighter, and additional U.S. currency. At some point, Dangerfield attempted to step on the bag of heroin pulled from his pocket.

[6] After Detective Wolfe was notified of the search of Dangerfield's person and the discovered contraband, he explained to Dangerfield why the officers were present at his residence, advised him of his rights, and obtained the signatures of Dangerfield and his wife on a standard IMPD consent to search form, allowing officers to search the residence. While officers entered the house using keys recovered from Dangerfield, Detective Wolfe interviewed Dangerfield. Officers found, among other items, "over three thousand dollars" "largely made up of . . . twenty dollar bills" in a pair of men's sweat pants in what was established as the residence's master bedroom; a digital scale, a hammer, a

"Magic Bullet type blender grinder," and a bottle of "cut," or a "substance that you would mix with the heroin like . . . more of the product" to sell and "make more money", on the counter to the right of the sink between the sink and the refrigerator in the kitchen; a box of plastic baggies in the drawer directly below the area where the digital scale and bottle of "cut" substance were located and "right next to the suspected narcotics"; and a hydraulic press at the back left corner of the garage and a bag "just left of the press" with a box of ammunition and "another small baggie of suspected narcotics" inside. *Id.* at 87, 89, 117, 120, 135.

[7] On April 15, 2016, Detective Wolfe completed an affidavit for probable cause. The same day, the State charged Dangerfield with three counts of dealing in a narcotic drug as level 2 felonies, one count of possession of a narcotic drug as a level 3 felony, two counts of possession of a narcotic drug as level 4 felonies, unlawful possession of a firearm by a serious violent felon, a level 4 felony, and possession of cocaine as a level 5 felony. On May 5, 2017, the State filed a motion to dismiss, asking to dismiss two counts of dealing in a narcotic drug as level 2 felonies and the two counts of possession of a narcotic drug as level 4 felonies, which the court granted. The court also dismissed the single count of unlawful possession of a firearm by a serious violent felon upon motion by the State.

[8] On August 29, 2017, the court held a jury trial. Prior to trial, the court addressed preliminary matters, and Dangerfield's counsel asked to suppress the evidence obtained on April 13, 2016, and argued that the detectives lacked

probable cause to stop Dangerfield and his wife. In response, the State presented testimony of Detective Wolfe regarding the three foregoing controlled purchases. Detective Wolfe testified that the general procedure taken to prepare informants to conduct controlled purchases involved searching the vehicle and the informant before sending the informant down to conduct the purchase and sometimes placing a call "down to the target" which would be recorded. *Id.* at 17. He also testified that, at the point where he "ha[d] three buys on [Dangerfield]," he knew that Dangerfield had been sentenced, was on home detention for dealing, and that "[d]ealing in narcotics would be a violation of [Dangerfield's] community correction sentence." *Id.* at 24. After cross-examining Detective Wolfe, Dangerfield's defense counsel stated that, if it was his intention to arrest Dangerfield on April 13, 2016, Detective Wolfe should have sought an arrest warrant from a judicial officer because all three controlled purchases occurred prior to the arrest date. Counsel for the State responded in part, "[t]here's no requirement that they get a warrant unless he's holed up in a house somewhere. Here the arrest was made as [Dangerfield] was leaving his home." The court, in finding that Detective Wolfe had probable cause to arrest Dangerfield for a felony, stated:

> I think based on all of the circumstances that was known to
> Detective Wolfe, based on the three previous [purchases] I don't
> find that they were so remote in time as to perhaps lose their
> value in terms of – of – lose their probative value. All of the
> circumstances surrounding those [purchases] including
> knowledge of Detective Wolfe and including the audio and video
> recordings of that. I don't think there's anything in the law that I

am aware of that would mandate that the – the behavior or the offense occurred at the time or directly before the time of arrest.[1]

*Id.* at 31-32.

[9] Detective Wolfe testified at trial that, when he interviewed him, Dangerfield admitted the quantity of the money recovered from the hood of the car was about forty-seven hundred dollars, that officers had recovered heroin on the ground in front of the car in the quantity of "over forty grams" and from his pocket, and that he had been currently selling heroin at about fifty dollars per gram. *Id.* at 92. He also indicated that he recognized the contents of the bag that Dangerfield had placed on the ground as "suspected heroin" based on his training and experience as a narcotics detective. *Id.* at 81. He testified that the garage was "an attached garage, which is part of the home," when asked if Dangerfield and his wife consented to the search of the garage. *Id.* at 98.

[10] IMPD Detective Randall Dings testified, when asked what happened after Dangerfield exited the house, that "[a]s we pulled up, I made eye contact with [Dangerfield]. And he just kind of looked at us. Did a little head tilt to try to figure out who we – what we were doing." *Id.* at 110-111. In response to being asked, "as you all got out and headed up towards [Dangerfield], what happened next," he stated:

---

[1] Dangerfield's counsel asked to certify the ruling with this Court, and the trial court responded that it would "deny that motion in terms of an Interlocutory request." Transcript Volume 2 at 32.

> Detective Wolfe and Detective Graber were giving him commands. Detective Graber made contact – and Wolfe made contact with [Dangerfield]. I observed – originally I observed [Dangerfield] kind of bend down a little bit but I couldn't see what he was doing. And he stood up as they got to him. And then I saw him set a large amount of cash on the hood of the car.

*Id.* at 111. He also indicated that plastic baggies, while common to have in a normal kitchen, are typically used as a "a way to package the narcotics for sale." *Id.* at 120.

[11] IMPD Detective Ryan Graber testified that he arrived at the scene on April 13, 2016, and was involved in the search of the garage of the residence. He also testified that hydraulic presses were commonly known to narcotics detectives through experience as items used to re-press narcotics.

[12] The court admitted into evidence, over objection, the State's photographs of items discovered that day, as well as the Consent to Search form signed by Dangerfield and his wife as State's Exhibit 5 and photographs of the residence.

[13] The jury found Dangerfield guilty of dealing in a narcotic drug as a level 2 felony and not guilty of possession of cocaine as a level 5 felony.[2] The court found Dangerfield to be an habitual offender and sentenced him to twenty years

---

[2] The jury also found Dangerfield guilty of possession of a narcotic drug as a level 4 felony, but the court vacated the judgment at the State's request.

for dealing in a narcotic drug as a level 2 felony enhanced by six years for being an habitual offender.

## Discussion

[14] The issue is whether the trial court abused its discretion in admitting the evidence obtained as the result of Dangerfield's arrest. Although Dangerfield originally challenged the admission of the evidence through a motion to suppress, he now challenges the admission of the evidence at trial. Thus, the issue is appropriately framed as whether the trial court abused its discretion by admitting the evidence. *See Jefferson v. State*, 891 N.E.2d 77, 80 (Ind. Ct. App. 2008), *trans. denied*; *Lundquist v. State*, 834 N.E.2d 1061, 1067 (Ind. Ct. App. 2005).

[15] "Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion and reverse only if a ruling is 'clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.'" *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014) (quoting *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013)). "[T]he ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo." *Id.* Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*. We may affirm a trial court's decision to admit evidence seized as a result of the search based on any legal theory supported by the record. *Crawford v. State*, 770 N.E.2d 775, 780 (Ind. 2002);

*Jester v. State*, 724 N.E.2d 235, 240 (Ind. 2000). In ruling on admissibility following the denial of a motion to suppress, the trial court considers the foundational evidence presented at trial. *Carpenter*, 18 N.E.3d at 1001. If the foundational evidence at trial is not the same as that presented at the suppression hearing, the trial court must make its decision based upon trial evidence and may consider hearing evidence only if it does not conflict with trial evidence. *Guilmette v. State*, 14 N.E.3d 38, 40 n.1 (Ind. 2014).

[16] Dangerfield argues that the police lacked probable cause for his arrest and that his rights under the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution were violated when he was "arrested without benefit of a warrant and no crime was in progress."[3] Appellant's Brief at 10.

A. *Fourth Amendment*

[17] The Fourth Amendment to the United States Constitution provides, in pertinent part: "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

---

[3] To the extent that Dangerfield claims his Sixth Amendment confrontation rights were violated, we note that this Court does not address constitutional arguments which are raised for the first time on appeal. *See Leonard v. State*, 80 N.E.3d 878, 884 n.4 (Ind. 2017) (quoting *Plank v. Cmty. Hosps. of Ind., Inc.*, 981 N.E.2d 49, 53 (Ind. 2013) ("Declining to review an issue not properly preserved for review is essentially a cardinal princip[le] of sound judicial administration." (internal quotation omitted))). Waiver notwithstanding, the record reveals that the CI did not testify at trial and Dangerfield did not attempt to subpoena the CI as a witness. Under the circumstances, we cannot say that Dangerfield's Sixth Amendment confrontation rights were violated.

violated . . . ." U.S. CONST. amend. IV. If the search is conducted without a warrant, the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies. *Osborne v. State*, 63 N.E.3d 329, 331 (Ind. 2016). The United States Supreme Court has held that "the warrantless arrest of an individual in a public place upon probable cause [does] not violate the Fourth Amendment." *United States v. Santana*, 427 U.S. 38, 42 96 S. Ct. 2406, 2409 (1976) (citing *United States v. Watson*, 423 U.S. 411 [96 S. Ct. 820] (1976)). *See also Sears v. State*, 668 N.E.2d 662, 666-667 (Ind. 1996) ("It is equally well settled that a police officer may arrest a suspect without a warrant if that officer has probable cause to believe that the suspect has committed a felony.").

[18] Probable cause to arrest arises when, at the time of the arrest, the arresting officer has knowledge of facts and circumstances which would warrant a person of reasonable caution to believe that the defendant committed the criminal act in question. *Thomas v. State*, 81 N.E.3d 621, 626 (Ind. 2017) (citing *Sears*, 668 N.E.2d at 667 (citing *Green v. State*, 461 N.E.2d 108, 112 (Ind. 1984))). The amount of evidence necessary to satisfy the probable cause requirement for a warrantless arrest is evaluated on a case-by-case basis. *Id.* (citing *Peterson v. State*, 674 N.E.2d 528, 536 (Ind. 1996), *reh'g denied*, *cert. denied*, 522 U.S. 1078, 118 S.Ct. 858 (1998)). Rather than requiring a precise mathematical computation, probable cause is grounded in notions of common sense. *Id.* (citing *Ogle v. State*, 698 N.E.2d 1146, 1148 (Ind. 1998) (citing *Illinois v. Gates*, 462 U.S. 213, 235-236, 103 S.Ct. 2317 (1983))). The evidence required to

establish guilt is not necessary for probable cause for an arrest to exist. *Decker v. State*, 19 N.E.3d 368, 377 (Ind. Ct. App. 2014) (quoting *Roberts v. State*, 599 N.E.2d 595, 598 (Ind. 1992), *reh'g denied*), *trans. denied*. The existence of probable cause is a fact-sensitive determination. *Id.* (citing *Kelly v. State*, 997 N.E.2d 1045, 1051 (Ind. 2013)).

[19] To effect a lawful arrest, police needed to have probable cause to believe that Dangerfield dealt in a narcotic drug as defined by Indiana law. *See id.* At the time of the offense, Ind. Code § 35-48-4-1(a)(2) governed the dealing of narcotic drugs and provided in relevant part that a person who "possesses, with intent to . . . manufacture[,] finance the manufacture of[,] deliver[,] or finance the delivery of . . . cocaine or a narcotic drug, pure or adulterated, classified in schedule I or II . . . commits dealing in a narcotic drug . . . ." (Subsequently amended by Pub. L. No. 44-2016, § 2 (eff. July 1, 2016)). Ind. Code § 35-48-4-1(e) provided at the time of the offense that the offense be considered a level 2 felony if "the amount of the drug involved is at least ten (10) grams." (Subsequently amended by Pub. L. No. 44-2016, § 2 (eff. July 1, 2016)).

[20] Dangerfield contends that the trial court abused its discretion by failing to suppress the evidence obtained during the warrantless arrest, and that the proper result should be suppression of "all the evidence stemming from [Dangerfield's] arrest." Appellant's Brief at 16. He asserts that Detective Wolfe led a squad of detectives and officers to Dangerfield's residence without an arrest warrant and saw no drug distribution or other crime in progress when the police approached him. He states that "[a]rguendo, in [this] case, the totality of

requisite facts and circumstances supporting probable cause seem to exist to support Judge Gooden's finding." *Id.* at 13 (citing Appellant's Appendix Volume 2 at 21-24; Transcript Volume 2 at 16-24, 32, 36). He continues to argue, "[h]owever, that determination is negated by the fact that the charges directly associated with the controlled [purchases] creating [Detective] Wolfe's probable cause were dismissed." *Id.* In his reply brief, Dangerfield contends that he was not arrested in a public place nor did he forsake a reasonable expectation of privacy because he was arrested in his driveway, or "arguably within the ambit of his home's curtilage, which is an area usually protected from warrantless searches." Appellant's Reply Brief at 6-7 (quoting BLACK'S LAW DICTIONARY 411-412 (8th ed. 2004) (quoting C.J.S. §§ 36, 71)).

[21] The State argues that the police had probable cause to arrest Dangerfield and properly conducted a warrantless arrest of him in a public place, namely, the driveway outside of his home. Specifically, the State argues that the three controlled purchases of heroin conducted since March 7, 2016, provided ample probable cause and that its exercise of discretion in charging Dangerfield is irrelevant to the existence of probable cause at the time of his arrest.

[22] To the extent that Dangerfield argues that the trial court's probable cause determination is negated because "the charges directly associated with the controlled [purchases] creating [Detective] Wolfe's probable cause were dismissed," we observe that the Indiana Supreme Court has held that the "facts and circumstances of which the arresting officer has knowledge that give him probable cause to believe a crime has been committed, need not be the same

crime with which the defendant is ultimately charged." *Moody v. State*, 448 N.E.2d 660, 663 (Ind. 1983).

[23] With respect to whether Detective Wolfe and other police officers had probable cause, the record reveals that the police arranged three different controlled purchases of heroin from Dangerfield through the CI, who, each time, was provided with pre-recorded purchase money and recording equipment, travelled to pre-determined locations, and captured audio or video footage of the purchase. Detective Wolfe reviewed footage of the purchases, identified Dangerfield as the person who had sold the heroin to the CI, and researched and discovered that Dangerfield was on home detention, as well as the relevant details of the home detention. As the officers approached Dangerfield on April 13, 2016, outside of his residence he had exited, he reached into his jeans to place a clear plastic baggie with a grayish substance that was recognized as "suspected heroin" on the ground and removed and placed a "little over forty-seven hundred dollars," comprised of twenty-dollar bills, on the hood of the car. *Id.* at 81. Based upon the record, we conclude that Detective Wolfe and other police officers had probable cause to arrest Dangerfield. Accordingly, we cannot say Dangerfield's arrest violated the Fourth Amendment to the United States Constitution.

B. *Article 1, Section 11*

[24] Article 1, Section 11 of the Indiana Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

[25] Although its text mirrors the federal Fourth Amendment, we interpret Article 1, Section 11 of our Indiana Constitution separately and independently. *Robinson v. State*, 5 N.E.3d 362, 368 (Ind. 2014) (quoting *State v. Washington*, 898 N.E.2d 1200, 1205-1206 (Ind. 2008), *reh'g denied*). "When a defendant raises a Section 11 claim, the State must show the police conduct 'was reasonable under the totality of the circumstances.'" *Id.* "The focus of the exclusionary rule under the Indiana Constitution is the reasonableness of police conduct." *Hardister v. State*, 849 N.E.2d 563, 573 (Ind. 2006). "We consider three factors when evaluating reasonableness: '1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.'" *Robinson*, 5 N.E.3d at 368 (quoting *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005)).

[26] Dangerfield argues that the three reasonableness factors established in *Litchfield v. State*, 824 N.E.2d 356 (Ind. 2005), require that "police should have obtained a warrant instead of relying on information from a Confidential Informant wholly unrelated to the conduct charged in this case." Appellant's Reply Brief at 8. The State contends that Dangerfield's argument is waived for failure to

present it below and argues that the police conduct was eminently reasonable as police had probable cause for Dangerfield's arrest from the proper execution of three controlled purchases of heroin that were audio and video recorded.

[27] We note that the entirety of Dangerfield's argument regarding the reasonableness factors under Article 1, Section 11, of the Indiana Constitution appears initially in his reply brief. Though he mentions both the Fourth Amendment and Article 1, Section 11, in his principal brief, he fails to provide an independent analysis of the reasonableness factors under the Indiana Constitution until his reply brief. Issues are waived if raised for the first time in a reply brief. *Sisson v. State*, 985 N.E.2d 1, 14 n.8 (Ind. Ct. App. 2012) (quoting *Curtis v. State*, 948 N.E.2d 1143, 1148 (Ind. 2011)), *trans. denied*. *See also Decker*, 19 N.E.3d at 375 n.3 ("Failure to make a cogent argument under the Indiana Constitution constitutes waiver of the issue on appeal.") (citing *Abel v. State*, 773 N.E.2d 276, 278 n.1 (Ind. 2002)).

[28] Notwithstanding any issues of waiver, we cannot agree with Dangerfield to the extent that he argues that the police conduct was not reasonable under the totality of the circumstances. To the extent that he does argue reasonableness factors, he asserts that the degree of concern, suspicion, or knowledge that a violation has occurred is tainted "by the fact that [Dangerfield] was already under surveillance on April 13, 2016, and that no criminal activity was observed independently by police contemporaneous to the time he was arrested at his home without a warrant"; that the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities was "total"

because he was "removed from his home and taken into custody"; and, that the extent of law enforcement needs to make a warrantless arrest was "minimal, at best" because the investigation lasted over a month. *Id.* at 7-8.

[29] The record reveals that, with respect to both the degree of concern, suspicion, or knowledge that a violation had occurred and the extent of law enforcement needs, police conducted three controlled purchases of heroin from Dangerfield, who was identified by Detective Wolfe after reviewing video and audio footage which had been recorded by the CI. The record also reveals that the degree of intrusion on Dangerfield's ordinary activities was not high. Officers arrived at the residence where Dangerfield was serving home detention and parked away from the residence. He eventually exited the house and walked to a green Chrysler 300 parked in the driverway. When officers approached him and identified themselves, Dangerfield backed away toward the garage and moved to the front bumper of the Chrysler; reached into the front part of his blue jeans, ducked down, and placed on the ground a "clear plastic baggie with a grayish substance" which Detective Wolfe recognized as "suspected heroin" based on his training and experience; and, after starting to stand, reached again into his waistband, and removed and placed a "little over forty-seven hundred dollars" "made mainly of twenties" on the hood of the car. Transcript Volume 2 at 77, 81, 92.

[30] Under these circumstances, we conclude that Dangerfield's rights against unreasonable search and seizure under Article 1, Section 11 of the Indiana

Constitution were not violated. Accordingly, we cannot say that the trial court abused its discretion.

## *Conclusion*

[31] For the foregoing reasons, we affirm Dangerfield's conviction.

[32] Affirmed.

Bailey, J., and Crone, J., concur.